**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**EMPIRE STATE ETHANOL AND**
**ENERGY, LLC,**

                     **Plaintiff,**                 **1:08-CV-623**
                                                    **(GLS/DRH)**

           **v.**

**BBI INTERNATIONAL; MIKE BRYAN,**
*Individually and in his capacity as Chief*
*Executive Officer*, **MARK YANCEY,**
*Individually and in his capacity as Vice*
*President of Project Development, BBI*
*International*; **ALBANY RENEWABLE**
**ENERGY, LLC; BIO-PRO**
**RESOURCES, LLC,** *on its own behalf*
*and in its capacity as Member Albany*
*Renewable Energy, LLC*; **JEFF**
**KISTNER,** *Individually and in his*
*capacity as Member of Bio-Pro*
*Resources, LLC, and/or Albany*
*Renewable Energy, LLC*; **ED STAHL,**
*Individually and in his capacity as*
*Member of Bio-Pro Resources, LLC,*
*and/or Albany Renewable Energy, LLC,*

                     **Defendants.**
_____

**APPEARANCES:**                   **OF COUNSEL:**

**FOR THE PLAINTIFF:**

Hiscock, Barclay Law Firm        WILLIAM A. HURST, ESQ.
50 Beaver Street
Fifth Floor
Albany, NY 12207-2830

**FOR DEFENDANTS:**

**BBI International, Mark
Yancey and Mike Bryan**
Brown Winick Law Firm                  HALEY R. VAN LOON, ESQ.
666 Grand Avenue                       SCOTT L. LONG, ESQ.
Suite 2000
Des Moines, IA 50309

West Firm, PLLC                        YVONNE E. MARCIANO, ESQ.
677 Broadway
8th Floor
Albany, NY 12207

**Jeff Kistner**
Hancock, Estabrook Law Firm            MICHAEL J. SCIOTTI, ESQ.
1500 AXA Tower 1
Syracuse, NY 13221

**Ed Stahl, Albany Renewable
Energy, LLC, Bio-Pro
Resources, LLC**
Hoffmann, Hubert Law Firm              TERRANCE J. HOFFMANN, ESQ.
4629 Onondaga Boulevard
Syracuse, NY 13219

**Gary L. Sharpe
U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Empire State Ethanol and Energy, LLC ("Empire") brings this

action against defendants BBI International ("BBI"), Mike Bryan ("Bryan"),

Mark Yancey ("Yancey"), Albany Renewable Energy, LLC ("ARE"), Bio-Pro Resources, LLC ("Bio-Pro"), Jeff Kistner ("Kistner") and Ed Stahl ("Stahl"), alleging violations of the Sherman and Clayton Acts, as well as various state statutory and common law claims.  (*See* Dkt. No. 17.)  Pending are: 1) defendants' motions to compel arbitration and to dismiss under FED. R. CIV. P. 12(b)(6) (*See* Dkt. Nos. 25, 26, 28); and 2) BBI, Bryan and Yancey's motion for a civil gag order (*See* Dkt. No. 36.), in which the remaining defendants join (*See* Dkt. Nos. 44, 47).  For the reasons that follow, the court: 1) grants BBI, Bryan and Yancey's motion to compel arbitration and stays this action as against them in lieu of dismissal; 2) denies ARE, Bio-Pro, Kistner and Stahl's motions to compel arbitration and dismiss, with leave to make a renewed motion for a discretionary stay; and 3) denies the motion for a gag order.

## II.  **Background**[1]

### A.    **Allegations Relevant to the Motion to Dismiss**

Empire is a New York limited liability company organized for the purpose of constructing and operating an ethanol plant in New York.  (*See*

---

[1]The allegations and facts are derived from Empire's amended complaint and the parties' Project Development Agreement, which is incorporated into Empire's amended complaint by reference, and thus properly considered by the court. *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156-57 (2d Cir. 2006).

Am. Compl. ¶¶ 5, 19; Dkt. No. 17.)  BBI is a Colorado corporation and the

leading provider of project development and consulting services in the bio-

fuels industry.  *Id*. at ¶¶ 6-8.  In 2006, Empire retained BBI to conduct a

study regarding the feasibility of entering the biofuels market in New York

(the "FS").  *Id.* at ¶ 20.  In January and July of 2007, BBI issued FS reports

which recommended Oneonta, New York as a potential site for an ethanol

plant.  *Id*. at ¶ 28.  However, BBI never recommended the Port of Albany,

New York, which was allegedly a far more desirable site.  *Id*. at ¶ 49.

On May 2, 2007, Empire and BBI entered into a Project Development

Agreement ("PDA") under which BBI assumed control of Empire's plant

project, then focused on Oneonta.  (*See* Ex. A. to Marciano Declaration;

Dkt. No. 25.)  The PDA contained an arbitration provision requiring

arbitration of "any dispute or controversy arising between the Parties hereto

under or relating to [the PDA] or [BBI's] performance or nonperformance of

its obligations hereunder."  (*See* Ex. A. to Marciano Declaration at ¶ 7; Dkt.

No. 25.)  The PDA also contained a confidentiality provision which required

BBI to maintain confidentiality of Empire's proprietary business information.

(*See* Am. Compl. ¶ 35; Dkt. No. 17.)   BBI was obligated, *inter alia*, to

"recommend" and "assist" in the selection of contractors and professionals

for Empire's project under the PDA, and Empire contends BBI actually made its services contingent on the retention of pre-selected professionals (the "preferred partners") at set prices.  (*See id*. at ¶¶ 30, 42; Ex. A. to Marciano Declaration at pgs 5-7; Dkt. No. 25.)  The PDA could be terminated by BBI on thirty days notice only if it was unable to perform its obligations for sixty days as a direct result of Empire's actions.  (*See* Ex. A. to Marciano Declaration at ¶ 5; Dkt. No. 25.)

Unbeknownst to Empire at the time it entered into the PDA, Kistner and Stahl, both high ranking BBI employees, had created Bio-Pro in April of 2007, for the purpose of developing an ethanol plant in New York that would compete directly with Empire's proposed plant. (*See* Am. Compl. ¶¶ 29, 70; Dkt. No. 17.)  Bio-Pro was created with the knowledge, encouragement and consent of BBI, its CEO, Bryan, and its Vice-President of Project Development, Yancey.  *Id*. at ¶¶ 29, 38.   Soon after the PDA was executed, Bryan and Yancey appointed Stahl and Kistner to oversee certain aspects of Empire's project under the PDA, in which capacity they had access to all manner of Empire's confidential information.  *Id*. at ¶ 36, 37, 39.

In or around September of 2007, Empire independently determined

5

that the Port of Albany was a more feasible site for the ethanol plant than

Oneonta, and proposed a supplemental FS be conducted by BBI.  *Id.* at ¶¶

50, 53.  Empire's requests were met with inexplicable recalcitrance, and on

November 7, 2008, Yancey informed Empire that BBI could not perform the

supplemental FS because it was focusing on the development of a new

technology.  *Id*. at ¶¶ 54-55.  Relying on Yancey's representations, which

Empire contends were false, Empire conceded to the termination of the

PDA.  *Id.* at ¶¶ 56-59.

    At approximately the same time, the Albany-Rensselaer Port District

Commission issued a request for proposals ("RFP"), for the leasing and

development of approximately 18 acres of land at the Port of Albany.  *Id*. at

¶ 74.  On November 9, 2007, Kistner formed a Delaware company named

New York Renewable Energy, LLC, which subsequently became ARE on

November 16, 2007.  *Id*. at ¶¶ 60-61.  The sole member of ARE was Bio-

Pro.  *Id*. at ¶ 13.  Stahl and Kistner then submitted an ethanol plant

proposal on behalf of ARE using their BBI contact information with BBI's

encouragement and consent.  *Id*. at ¶¶ 72-73.  ARE's submissions in

response to the RFP also identified BBI as a project partner and the

preferred partners who had previously been recommended to Empire by

BBI as participants in ARE's proposal.  *Id*. at ¶ 84.  Many of these same

preferred partners inexplicably terminated their relationship with Empire

after the cancellation of the PDA.  *Id*.  Additionally, much of the research,

data and information supporting ARE's submissions was virtually identical

to that BBI had previously prepared for Empire under the PDA.  *Id*.  ARE

was awarded the contract with the Port of Albany on April 1, 2008.  *Id*. at ¶

3.

On June 13, 2008, Empire filed this action.  Empire's amended

complaint sets forth the following ten claims: 1) violation of § 1 of the

Sherman Act; 2) violation of § 2 of the Sherman Act; 3) violation of § 3 of

the Clayton Act; 4) violation of N.Y. Gen. Bus. Law §§ 340-347; 5) breach

of contract; 6) fraud; 7) tortious interference with contract; 8) tortious

interference with prospective contractual relations; 9) breach of fiduciary

duties; and 10) piercing the corporate veil.  *Id*. at ¶¶ 97-170.

**B.**     **Allegations Relevant to the Motion for a Gag Order**

On August 20, 2008, a press release was purportedly issued by

Empire which stated, *inter alia*:

> BBI is also expanding their control of the ethanol industry, and
> now wants to become a producer, by forming their new venture
> BBI Bio Ventures, LLC. The industry is shifting from corn to

cellulosic ethanol production, and BBI is no longer satisfied
being just an industry consultant. They now want to develop
and operate their own cellulosic ethanol plants, and formed BBI
Bio Ventures, LLC, and named Mark Yancey as the CEO. "This
expanded market influence now potentially puts BBI in a
position in which they can take all of their consulting client's
confidential information, business plans, acquired knowledge,
business contacts, financial investors, and proposed plant
information to take over the industry business model in
cellulosic ethanol," said [Empire's managing member] Von
Zwehl. "We tried to amicable [sic] settle this, but they have not
even responded. I guess they feel they are above answering to
anyone but themselves," he concludes.

(*See* Marciano Decl. Ex. A; Dkt. No. 36.)  Similar press releases were

issued on September 5th, 10th, and 22nd of 2008, in which Von Zwehl and

Empire's counsel purportedly discussed the merits of Empire's lawsuit;

stated that "[i]rrefutable evidence shows BBI did commit a serious breach

of integrity and trust;" indicated that BBI was in a position to take its client's

sensitive materials for its own uses; and accused BBI of setting up illegal

shell companies to build monopoly control in the fuel ethanol market.  (*See*

Marciano Decl. Exs. C, D, H; Dkt. No. 36.)  Each of these press releases is

alleged to have resulted in articles in the Albany Times Union or the

Business Review.  (*See* Marciano Decl. Exs. B, E, F, I; Dkt. No. 36.)

Further, defendants contend that Empire gave a lengthy PowerPoint

presentation at a press conference which argued Empire's claims,

described BBI's wrongful acts and accused BBI officials of perjury.   (*See*

Marciano Decl. Ex. G; Dkt. No. 36.)  Thereafter this presentation was

posted to http://www.bbiconsulting.info/ESE/ESEvBBI_10-Sept-08_ppt.pdf-

a website which was not affiliated with BBI in any capacity.

Defendants assert that they have attempted to resolve these issues

with Empire's counsel without success.

## III.  Discussion

## A.   Defendants' Motion to Dismiss and Compel Arbitration; the Federal Arbitration Act[2]

"The Federal Arbitration Act [("FAA"), 9 U.S.C. § 1, *et seq.*,]  creates

a 'body of federal substantive law of arbitrability, applicable to any

arbitration agreement within the coverage of the Act.'"[3]  *PainWebber Inc. v.*

*Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (quoting *Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  The Act

represents "a strong federal policy favoring arbitration as an alternative

means of dispute resolution."  *Hartford Accident and Indem. Co. v. Swiss*

---

[2]The standard of review under FED. R. CIV. P. 12(b)(6), is well established and will not be repeated here.  For a full discussion of the standard the court refers the parties to its decision in *Dixon v. Albany County Bd. of Elections*, No. 1:08-CV-502, 2008 WL 4238708, at *2 (N.D.N.Y. Sept. 8, 2008).

[3]Neither party disputes that the arbitration agreement here is governed under the FAA, as the PDA clearly involved interstate commerce.  See 9 U.S.C. §§ 1, 2; *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995).

*Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001).  Accordingly,

"any doubts concerning the scope of arbitrable issues should be resolved

in favor of arbitration."  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

That said "arbitration is [still] a matter of contract[, thus] a party cannot be

required to submit to arbitration any dispute which he has not agreed so to

submit."  *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S.

574, 582 (1960).

The question of "whether an arbitration clause ... applies to a

particular type of controversy is for the court."  *Howsam v. Dean Witter*

*Reynolds, Inc.*, 537 U.S. 79, 84 (2002).  "In order to determine whether all

or part of the instant action should be sent to arbitration, the Court must

conduct the following inquiries:

> [F]irst, it must determine whether the parties agreed to arbitrate;
> second, it must determine the scope of that agreement; third, if
> federal statutory claims are asserted, it must consider whether
> Congress intended those claims to be nonarbitrable; and fourth,
> if the court concludes that some, but not all, of the claims in the
> case are arbitrable, it must then decide whether to stay the
> balance of the proceedings pending arbitration."

*JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004)

(quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir.

1998)).  Section 3 of the FAA directs courts to enter a stay in a case where

the asserted claims are "referable to arbitration."  9 U.S.C. § 3.

In the present instance, the parties do not dispute that the PDA contains an enforceable arbitration clause, and it is seemingly conceded that BBI, Bryan and Yancey may enforce that clause.  It is further agreed that the PDA's arbitration clause is a "broad clause," which covers Empire's third claim under Section 3 of the Clayton Act, its fifth claim for breach of contract, and its seventh claim for tortious interference with contract. However, the parties dispute: (1) whether ARE, Bio-Pro, Kistner and Stahl (collectively the "nonsignatory defendants") may enforce the arbitration agreement as nonsignatories to the PDA; (2) which of Empire's remaining claims are covered under the PDA's arbitration clause; and (3) the proper disposition of this case while arbitration is pending.  The court discusses each of these issues in turn.

### 1.  Parties to the Arbitrable Agreement

Initially, the court addresses the extent to which the nonsignatory defendants may invoke the PDA's arbitration clause.  In contending that the nonsignatory defendants cannot compel arbitration under the PDA, Empire asserts alternative estoppel is the only theory through which a signatory to an arbitrable agreement may be compelled to arbitration with a

11

nonsignatory, and that this doctrine is not satisfied here.  (*See* Empire Br. at 20-25; Dkt. No. 42.)  In response, Kistner and Stahl assert they are entitled to enforce the PDA's arbitration clause as employees of signatory BBI- regardless of whether estoppel applies.  (Kistner Reply Br. at 5-6; Dkt. No. 44; Stahl Reply Br. at 3-4; Dkt. No. 47.)  It is further asserted that ARE and Bio-Pro are entitled to invoke the arbitration clause under the alternative estoppel doctrine or a theory of agency.  (See Stahl Reply Br. at 6; Dkt. No. 47.)

Initially, the court rejects the nonsignatory defendants' agency argument.  It is true that past Circuit decisions have "consistently ... held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement."  *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993), *cert. denied*, 510 U.S. 945 (1993).  Further, the amended complaint here recites that "[a]t all pertinent times" Kistner and Stahl were "acting within the scope of [their] employment at BBI and in furtherance of BBI's business."  (*See* Am. Compl. ¶¶ 15, 16; Dkt. No. 17.)  Nonetheless, the court notes that Kistner and Stahl are not sued in their capacities as BBI officials, but rather as

members of ARE and/or Bio-Pro.[4]   In such capacity the nonsignatory

defendants may have been acting on BBI's behalf, but it was clearly

pursuant to an *undisclosed* agency relationship, as Empire was never

made aware of ARE or Bio-Pro's existence.  Nothing in the Circuit's

jurisprudence indicates that a nonsignatory to an arbitrable agreement may

compel arbitration on the basis of such an undisclosed agency relationship

with a signatory, even where there may also be a separate disclosed

agency relationship.  As such, ARE, Bio-Pro, and Kistner and Stahl as

members of these entities, are not entitled to enforce the PDA's arbitration

clause based upon an agency or employment relationship with BBI.

For similar reasons, the court agrees with Empire's contention that

the nonsignatory defendants cannot enforce the PDA's arbitration clause

under a theory of alternative estoppel.  Alternative estoppel is properly

applied where two conditions are met.  First, the claims which the

nonsignatory seeks to arbitrate must be factually "intertwined" with the

contract containing the arbitration clause.  *See Ross v. Am. Express Co.*,

---

[4]As such, the court rejects Empire's contention that it is also suing Kistner and Stahl in their capacity as BBI officials, as they have not been named in such capacity, and would clearly be entitled to compel arbitration under *Roby* to the extent they were.  Let this serve as warning that Empire will not be allowed to avoid arbitration with BBI by litigating claims arising out of actions Kistner and Stahl took in their capacities as BBI officials.

547 F.3d 137, 143-44 (2d Cir. 2008) (internal quotation marks and citation

omitted).  Second, "there must be a relationship among the parties of a

nature that justifies a conclusion that the party which agreed to arbitrate

with another entity should be estopped from denying an obligation to

arbitrate a similar dispute with the adversary which is not a party to the

arbitration agreement."  *Id*. at 144 (internal quotation marks and citations

omitted).  Cases where the Circuit has held that this second prong was

satisfied reveal a pattern in which:

> the promise to arbitrate by [one signatory], the entity opposing
> arbitration, was reasonably seen on the basis of the
> relationships among the parties as extending not only to [the
> other signatory], but also to [a non-signatory related to the
> latter], an entity that was, or would predictably become, *with
> [the] knowledge and consent [of the party opposing arbitration]*,
> affiliated or associated with [the other signatory] in such a
> manner as to make it unfair to allow [the party opposing
> arbitration] to avoid its commitment to arbitrate on the ground
> that [the non-signatory] was not the very entity with which [the
> party opposing arbitration] had a contract.

*Id*. at 145-46 (citation omitted; emphasis added; other alterations in

original).

Here, the court's discussion *infra* at Point 2 establishes that the

claims asserted by Empire are intertwined with the PDA- satisfying the first

prong.  However, the existence of some relationship between Empire and

the nonsignatory defendants sufficient to demonstrate that Empire intended to arbitrate disputes with these defendants is clearly lacking.  *See id.* at 146.  Neither ARE nor Bio-Pro had any operational role under the PDA, or were identified or treated as BBI affiliates thereunder.  Indeed, ARE did not even exist when the PDA was entered into, and Bio-Pro had been created mere days earlier.  Further, there is no indication in the amended complaint that Empire was aware of, or ever dealt with, ARE and Bio-Pro during the relevant time frame.  Correspondingly, Empire is not alleged to have known that Kistner or Stahl were officers of these entities.  Thus, it cannot be said that Empire knew the nonsignatory defendants were or would predictably become affiliated with BBI at the time the PDA was executed, such that it would be reasonable to compel Empire to arbitrate its claims against them. "In sum, arbitration is a matter of contract and, contractually speaking, [Empire] did not know [ARE, Bio-Pro or Kistner and Stahl as members of these companies] from Adam."  *Id*.  Accordingly, the court declines to order arbitration of Empire's claims against ARE, Bio-Pro, Kistner or Stahl.

### 2.  Claims Subsumed by the Arbitration Agreement

Having determined that only defendants BBI, Bryan and Yancey are entitled to enforce the PDA's arbitration clause, the court next addresses

which of Empire's claims against them are subject to arbitration.

Where an arbitration clause is broad, as is the case here, a

presumption of arbitrability arises and:

> arbitration of even a collateral matter will be ordered if the claim
> alleged implicates issues of contract construction or the parties'
> rights and obligations under it.  Moreover, when parties use
> expansive language in drafting an arbitration clause,
> presumably they intend all issues that touch matters within the
> main agreement to be arbitrated.

*ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24,

34 (2d Cir. 2002) (internal quotation marks and citation omitted).  In

assessing the arbitrability of a claim, courts must "focus on the allegations

in the complaint rather than the legal causes of action asserted."  *Genesco,*

*Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) (citation

omitted).  The presumption of arbitration may be overcome only if "it can be

said with positive assurance that an arbitration clause is not susceptible to

an interpretation that covers the asserted dispute."  *Sprecht v. Netscape*

*Commc'ns Corp.*, 306 F.3d 17, 35 (2d Cir. 2002) (internal quotation marks

and citation omitted).

### a)  Empire's Antitrust Claims

Empire's first, second, and fourth claims arise under Sections 1 and 2

of the Sherman Act, and Sections 340-347 of the N.Y. GEN. BUS. LAW

(collectively the "antitrust claims"), respectively.  Defendants contend that

these claims must be submitted to arbitration because they "touch upon"

the parties rights and obligations under the PDA.  (*See* BBI Br. at 17-21;

Dkt. No. 25:8.)  Empire counters that its antitrust claims implicate only

defendants conspiracy to create a vertical monopoly[5] over the New York

bio-fuels market, and are thus independent of the PDA.  (*See* Empire Br. at

12-16; Dkt. No. 42.)

The court finds the Supreme Court case of *Mitsubishi Motors Corp. v.*

*Soler Chryslyer-Plymouth, Inc.*, 473 U.S. 614 (1985), and the Second

Circuit case of *JLM Industries, Inc.*, 387 F.3d at 163, instructive in resolving

this dispute.  In *Mitsubishi*, an automobile dealer in Puerto Rico claimed

that Mitsubishi and its affiliate, CISA, had violated the Sherman Act through

a vertical conspiracy to divide markets in restraint of trade.  *Id*. at 620.  As

part of this plan, Mitsubishi had refused to allow the dealer to resell

vehicles outside of Puerto Rico that were purchased under an agreement

between the parties; had refused to sell parts to the dealer which would

---

[5]"Vertical conspiracies ... involve agreements between competitors at different levels of competition to restrain trade, such as agreements between a manufacturer and its distributors to exclude another distributor from a given product and geographic market."  *See, e.g., Crane & Shovel Sales Corp. v. Bucyrus-Erie, Co.*, 854 F.2d 802, 805 (6th Cir. 1988).

enable such resale; and had attempted to replace its Puerto Rico distributors with a wholly owned distributor.  *Id.*  This comprehensive conspiracy implicated matters significantly beyond the sales & distribution agreement between the parties.  Nonetheless, the Supreme Court indicated that the First Circuit had properly found the antitrust claims to be within the scope of the agreement's broad arbitration clause, stating "insofar as the allegations underlying the statutory claims touch matters covered by the [contract] the [First Circuit] properly resolved any doubts in favor of arbitrability."  *Id.* at 624 n.13.  The Court then went on to hold that arbitration of antitrust claims was not against public policy, effectively overruling the Second Circuit case of *American Safety Equipment Corp. v. J.P. Maguire & Co.*, 391 F.2d 821 (1986).[6]  *Id.* at 628-640.

In *JLM*, the Second Circuit reached a similar result.  There, plaintiff JLM traded in the bulk chemical business, and contracted with defendant shipping carriers to transport such chemicals through agreements containing broad arbitration clauses.  *See JLM*, 387 F.3d at 167.  JLM contended that the defendants had exploited their market power by, *inter*

---

[6]While the *Mitsubishi* Court limited the case's application to international transactions, subsequent decisions have extended its holding to the domestic realm.  *See, e.g., Hough v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 757 F. Supp. 283, 286 (S.D.N.Y. 1991), *aff'd*, 946 F.2d 883 (2d Cir. 1991).

*alia*, fixing contractual shipping rates at an unduly high rate and agreeing

not to compete with one another.  *Id*. at 168-69.  While recognizing that the

plaintiffs' antitrust claims did not implicate "interpretation, construction, or

application of any provision" of the contracts, the Circuit nonetheless held

the claims to be arbitrable, stating:

> the evidence supporting JLM's antitrust claims will not focus
> exclusively "upon the parties' conduct under the terms of the
> charter." Rather, ... JLM will try to proffer evidence of a
> conspiracy which was formed independently of the specific
> contractual relations between the parties. Nevertheless, JLM
> asserts that it suffered damages as a result of this conspiracy,
> and it could not have suffered these damages if it had not
> entered into the [contracts]."

*Id*. at 173, 175-76.

In the present instance, Empire's antitrust claims essentially allege

that defendants determined New York was a viable market through the

parties' contractual relationship under the PDA, and then used Empire's

proprietary information, research and contractors to monopolize the New

York ethanol market- "depriving Empire of the benefit of its contractual

bargain."  (See Am. Compl. ¶¶ 97-111, 121-23; Dkt. No. 17.)  As in

*Mitsubishi* and *JLM*, such allegations do not exclusively focus on the

arbitrable agreement.  However, they clearly "touch on" and "implicate" the

19

PDA insofar as it obligated BBI to maintain confidentiality over Empire's sensitive information, recommend contractors and generally assist Empire in its ethanol project.  Thus, "[t]he cental factual allegations in this case [seemingly] posit that a [monopolistic conspiracy] among the [defendants] undermined legitimate contractual relations between the parties."  *Id*. at 173.  Additionally, as in *JLM*, Empire's injuries here result from its contractual relations with BBI, since the alleged conspiracy largely came to fruition as a result of work done and access granted under the PDA.

Empire nonetheless contends that the Tenth Circuit case of *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995), requires that its antitrust claims be excluded from arbitration.  There, Coors entered into a licensing agreement under which Molson would brew and distribute Coors products.  *Id*. at 1512.  As in this case, the agreement between the parties contained a confidentiality clause and a broad arbitration clause. *Id*. at 1513.  Subsequently, Molson and Miller entered into an agreement whereby they would distribute each other's products.  Coors then brought suit under the Sherman and Clayton Acts contending, *inter alia*, that the Miller-Molson alliance would: 1) create a monopoly and 2) result in Miller's access to Coors' confidential information.  *Id*.  The Tenth Circuit found that

the second issue was arbitrable, but that the first was not because it was

"not related to the licensing agreement." *Id*. at 1517-18.

*Coors* is clearly distinguishable from the present case.  In *Coors*

there was no indication that Miller and Molson actually monopolized the

market using confidential information gained through the Molson-Coors

licensing agreement, or had conspired to do so.  As such, Coors' monopoly

claim was distinct from its concerns about Miller's access to confidential

information.  The monopoly claim was therefore properly excluded from

arbitration, as it did not touch upon the confidentiality provision of the

Molson-Coors licensing agreement.

Here, contrarily, Empire's antitrust claims explicitly allege that

defendants' conspiracy to monopolize the New York ethanol market was

realized through their access to Empire's confidential proprietary

information under the PDA, and in clear violation of the PDA's

confidentiality clause.  (See Am. Compl. ¶¶ 97-111, 121-23; Dkt. No. 17.)

Thus, Empire's antitrust claims clearly touch on the PDA and implicate the

parties' rights and obligations thereunder.  Accordingly, in light of the strong

policy in favor of arbitration, and resolving any doubts in favor of

arbitrability, the court finds that Empire's antitrust claims are arbitrable.[7]

*See also In re Currency Conversion Fee Antitrust Litigation*, 265 F. Supp. 2d 385, 409-10 (S.D.N.Y. 2003) (rejecting *Coors*).

### b) Empire's Tort Claims

Empire's sixth, eighth and ninth claims respectively state causes of action for fraud, tortious interference with prospective contractual duties and breach of fiduciary duties.  Quoting *McMahon v. RMS Elecs., Inc.*, 618 F. Supp. 189, 191 (S.D.N.Y. 1985), Empire contends that its fraud and fiduciary duties claims should not be subject to arbitration because they are "legally distinct from the contractual relationship between the parties," even if factually related.  (*See* Empire Br. at 16-17; Dkt. No. 42.)  Empire further asserts that its tortious interference with prospective contractual relations claim should not be submitted to arbitration "because it alleges that the

---

[7]The court further finds Empire's reliance on *Washburn v. Societe Commerciale de Reassurance*, 831 F.2d 149 (7th Cir. 1987), unavailing.  There the Court refused to compel arbitration of RICO claims where "[t]he litigation d[id] not involve a controversy arising under the agreement itself, but rather a conspiracy in which the conspirators used [the agreement containing the arbitration clause] ... and several other devices ... to" commit fraud.  *Id.* at 151. However, the decision in *Washburn* was based on an arbitration clause which only covered disputes "with respect to the interpretation of th[e] Agreement or the performance of the respective obligations of the parties under th[e] Agreement."  *Id.*  The arbitration clause at issue in the present case is clearly much broader, covering "any dispute or controversy arising between the Parties hereto under *or relating to [the PDA]* or [BBI's] performance or nonperformance of its obligations hereunder."  (*See* Ex. A. to Marciano Declaration at ¶ 7; Dkt. No. 25.) (emphasis added).  Here, Empire's antitrust claims relate to the PDA and defendants' obligations thereunder for the reasons stated *supra*.

defendants improperly interfered with plaintiff's prospective economic relations with a third party pursuant to a contract unrelated to the PDA." *Id.* at 18.  The court rejects these arguments.

Initially, the restrictive language Empire relies on from *McMahon* is derived from the Second Circuit case of *Old Dutch Farms, Inc. v. Milk Drivers and Dairy Emp. Local Union No. 584*, 359 F.2d 598, 603 (2d Cir. 1966), in which the Circuit indicated that "absent a clear, explicit statement in the [contract] directing an arbitrator to hear and determine the validity of tort damage claims by one party against another, it must be assumed that ... the parties did not intend to withdraw such disputes from judicial scrutiny."  However, this narrow approach to the arbitrability of tort claims has been negated in light of subsequent judicial recognition of the utility of arbitration.  *See, e.g., Interstate Brands Corp. v. Bakery Drivers & Bakery Goods Vending Machs., Local Union No. 550*, No. 96 CV 4454(SJ), 1998 WL 19974, at *8 (E.D.N.Y. Jan. 20, 1998), *aff'd*, 167 F.3d 764, 769 (2d Cir. 1999).  Accordingly, tort claims are currently subject to arbitration if the factual allegations which underlie them touch on issues within the parties' agreement or implicate their rights and obligations thereunder- just as with any other claim.  *See, e.g., Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*,

23

58 F.3d 16, 23 (2d Cir. 1995) (stating "[t]he mere fact that this is a tort claim, rather than one for breach of the Contracts, does not make the claim any less arbitrable").  Thus, with the proper standard illuminated, the court turns to the substance of the tort claims asserted herein.

Empire's breach of fiduciary duties claim alleges that the defendants diverted opportunities away from Empire, appointed conflicted employees to Empire's project, and disclosed Empire's confidential information in violation of duties assumed through the parties contractual relationship. (See Am. Compl. ¶¶ 152-62; Dkt. No. 17.)  Similarly, Empire's fraud claim asserts that defendants failed to disclose their conflicts of interests, made misrepresentations while under contract with Empire in order to gain access to Empire's confidential information, and subsequently requested cancellation of the PDA for pretextual reasons.  *Id.* at ¶¶ 131-38.  Lastly, the tortious interference with prospective contractual relations claim appears to arise out of Empire's contention that the defendants coerced the "preferred partners" to abandon Empire's project in favor of defendants' project, and used Empire's confidential research and information to support ARE's bid on the port of Albany.  *Id.* at ¶¶ 64-67, 76, 84, 146-51.

Each of these claims clearly implicates the PDA as a whole, as well

24

as specific provisions thereunder.  All three claims, for example, touch on

BBI's purported violation of the PDA's confidentiality clause.  *See Norcom*

*Elecs. Corp. v. CIM USA Inc.*, 104 F. Supp. 2d 198, 204 (S.D.N.Y. 2000)

(finding tortious interference claim arbitrable insofar as "the alleged misuse

of confidential information relates to the Agreement's confidentiality

provision").  Further, while Empire attempts to recast its breach of fiduciary

duties claim as "legally distinct" from its contract claims, the amended

complaint makes clear that such duties arose predominantly, if not entirely,

from the PDA.  Empire's fraud claim also relates to the clause in the PDA

indicating the conditions under which BBI could cancel the contract, insofar

as it is alleged that BBI caused the PDA to be cancelled on a pretext.

Finally, the tortious interference with prospective contractual relations claim

implicates BBI's duty under the PDA to recommend contractors and

professionals to Empire, insofar as the preferred partners were

subsequently purloined for defendants' own Port of Albany proposal.  Thus,

this claim is distinguishable from those Second Circuit decisions proffered

by Empire which have held "that a claim for tortious interference with

employment contracts does not arise under or relate to a *separate* sales

agreement" containing an arbitration clause.  *Collins & Aikman Prods. Co.*,

58 F.3d at 22 (emphasis added; internal quotation marks and citation

omitted).  Accordingly, the court finds that Empire's tort claims touch upon

and relate to the PDA, and are thus arbitrable.[8]

### 3.  Status of the Litigation while Arbitration is Pending

Defendants seek dismissal of those claims held to be arbitrable and a

stay pending arbitration as to the remaining claims.  (*See* BBI Br. at 17-21;

Dkt. No. 25:8, Stahl Br. at 6-7; Dkt. No. 28:3.)   Contrarily, Empire contends

that the court should stay those claims found to be arbitrable and proceed

with litigation as to the remainder.  (*See* Empire Br. at 1, 8 n.9, 19, 25; Dkt.

No. 42.)

Some courts in this Circuit have held that dismissal is appropriate

where all claims asserted against a defendant are arbitrable, as is the case

for BBI, Bryan and Yancey.  *See, e.g., Perry v. N.Y. Law School,* No. 03

Civ. 9221(GBH), 2004 WL 1698622, at *4 (S.D.N.Y. July 28, 2004).  *See

also, e.g., Choice Hotels Intern., Inc. v. BSR Tropicana Resort, Inc*., 252

F.3d 707, 709-10 (4th Cir. 2001).  However, this approach is inconsistent

with Section 3 of the FAA, 9 U.S.C. § 3, which instructs district courts to

---

[8]Empire's final cause of action seeks to pierce the corporate veil of ARE and Bio-Pro to reach Kistner and Stahl individually.  As the court has found that none of these entities are entitled to enforce the PDA's arbitration clause, it need not address the arbitrability of this claim.

"stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *McMahan Sec. Co. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 85 (2d Cir. 1994).   Accordingly, the court stays this action as to BBI, Bryan and Yancey pending arbitration of the claims asserted against them.   *See Halim v. Great Gatsby's Auction Gallery*, 516 F.3d 557, 561 (7th Cir. 2008) ("[T]he proper course of action when a party seeks to invoke an arbitration clause is to stay the proceedings rather than to dismiss outright."); *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 268-69 (3d Cir. 2004) (same); *McCaddin v. Se. Marine Inc.*, 567 F. Supp. 2d 373, 385 (E.D.N.Y. 2008) (same).

Contrarily, the nonsignatory defendants are not entitled to a Section 3 stay or dismissal, since they are not parties to the PDA.   *See Citrus Mktg. Bd. of Isr. v. J. Lauritzen A/S*, 943 F.2d 220, 224-25 (2d Cir. 1991). Further, while the court has the discretionary power to order a stay where the issues in the case are germane to those in arbitration, *see Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991), the nonsignatory defendants have not established their entitlement to such relief.   A defendant seeking a discretionary stay must demonstrate "to the satisfaction of the court that he ha[s] not taken nor will [he] take any steps to hamper the progress of the

arbitration proceeding, that the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship." *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964); *see also Citrus Mktg. Bd. of Isr.,* 943 F.2d at 225.  The nonsignatory defendants have not attempted to satisfy, or even acknowledged, these requirements.  As such, the court declines to stay this action as against them while arbitration is pending, though the court will permit a renewed motion on the issue.

**B.    Defendants' Motion for a Gag Order**

Finally, defendants assert that a civil gag order is warranted here because "a reasonable likelihood" exists that Empire's media disclosures will prejudice their right to a fair trial and damage their business interests. As such, they seek an order "(1) prohibiting Plaintiff and its attorney from further communicating with representatives of the media, or with any person or entity whom Plaintiff or its attorney knows or would have reason to know might disseminate information to the public or media; [and] (2) requiring Plaintiff to take all steps necessary to remove from the internet its prior media disclosures, press releases and presentations." (*See* BBI Gag Brief at 1-2; Dkt. No. 36:6.)  While the motion has been mooted in large

part as to BBI, Bryan, and Yancey, the court will nonetheless address it to the extent it remains pertinent as to ARE, Bio-Pro, Kistner and Stahl.

Prior restraints on pretrial publicity, such as those sought here, "are the most serious and the least tolerable infringement on First Amendment rights" which have historically been viewed as "presumptively unconstitutional." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976). The Supreme Court has indicated that such restraints are permissible only upon evidence that: (1) "the nature and extent of pretrial news coverage" would impair the defendant's right to a fair trial; (2) "other measures would be [un]likely to mitigate the effects of unrestrained pretrial publicity;" and (3) "a restraining order would [effectively] operate to prevent the threatened danger." *Id*. at 562; s*ee also United States v. Salameh*, 992 F.2d 445, 446-47 (2d Cir. 1993).  Where a gag order is sought against an attorney, the defendant must show that the attorney's statements present a "substantial likelihood of materially prejudicing an adjudicative proceeding." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1075 (1991); *see also Salameh*, 992 F.2d at 446-47; 22 N.Y.C.R.R. § 1200.38.

Defendants cannot satisfy these standards.  First, Empire's counsel has averred that he did not make the statements attributed to him in the

media, (*See* Hurst Decl. at ¶ 4; Dkt. No. 41:1.), and the court's attempt to view the offending "bbiconsulting" website revealed that it is no longer available to the public.  Thus, it would appear that many of the concerns underlying the motion have been resolved or are groundless.

Further, the court is not convinced that the four press releases and attendant articles to which defendants object have resulted in such pervasive tainting of the jury pool that Empire and its counsel should be prohibited from all future media contact.  "[P]retrial publicity - even pervasive, adverse publicity - does not inevitably lead to an unfair trial." *Stuart*, 427 U.S. at 554.  Indeed, "[t]his may come as a surprise to lawyers and judges, but it is simply a fact of life that matters which interest them may be less fascinating to the public generally."  *See United States v. Haldeman*, 559 F.2d 31, 41 (D.C.Cir.1976).  Defendants have presented no evidence that the limited media attention of which they complain has or will reach a large number of potential jurors, or risks creating a general bias in favor of Empire.   As such, the court finds that the sweeping prior restraints defendants seek here - which would prohibit even nonprejudicial discussion - are clearly unjustified.  *See Bailey v. Sys. Innovation, Inc.*, 852 F.2d 93 (3d Cir. 1988); *CBS Inc. v. Young*, 522 F.2d 234, 238-40 (6th Cir. 1975)

(both finding court orders prohibiting all discussion of a case unconstitutional).

The court also notes that the requested gag order is inappropriate because the defendants have failed to establish that alternatives would be insufficient to protect their right to a fair trial. *See Salameh*, 992 F.2d at 447. "Through voir dire, ... a court can identify those jurors whose prior knowledge of the case would disable them from rendering an impartial verdict." *Press-Enterprise Co. v. Superior Court of Cal.*, 478 U.S. 1, 15 (1986). This protection is not easily negated, as the Fourth Circuit has explained:

> Our belief that *voir dire* will protect [defendant's] right to an impartial jury rests on a number of grounds. First we observe that "there is somewhat of a tendency to 'frequently overestimate the extent of the public's awareness of news....'" Secondly, even potential jurors aware of the coverage ... are not disqualified from sitting so long as they can set aside their impressions and adjudge the case on the basis of the evidence presented at trial.

*In re Application & Affidavit for a Search Warrant*, 923 F.2d 324, 329 (4th Cir. 1991) (citation omitted). In the present instance the court is similarly convinced that defendants' fair trial rights can be preserved through careful jury selection. Accordingly, defendants' motion for a civil gag order is

denied.

## IV.  <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that BBI, Bryan and Yancey's motion to compel

arbitration (Dkt. No. 25.) is granted and the action is stayed as against

these defendants under 9 U.S.C. § 3 in lieu of dismissal; and it is further

**ORDERED** that ARE, Bio-Pro, Kistner and Stahl's motions to compel

arbitration and dismiss (Dkt. Nos. 26, 28.) are denied, with leave to make a

renewed motion for a discretionary stay; and it is further

**ORDERED** that the motion for a civil gag order (Dkt. No. 36.) is

denied; and it is further

**ORDERED** that the Clerk of the Court provide a copy of this Order

to the parties by regular mail.

**IT IS SO ORDERED.**

Albany, New York
March 20, 2009

_____
United States District Court Judge